[No. S004682. Aug. 28, 1989.]

DONALD C. CRAIB, as Deputy Labor Commissioner, etc., Plaintiff and Respondent, v.
JAY S. BULMASH, as Trustee, etc., Defendant and Appellant.

COUNSEL

Jay S. Bulmash, in pro. per., and Hugh J. Haferkamp for Defendant and Appellant.

H. Thomas Cadell, Jr., and Marjorie J. Weinzweig for Plaintiff and Respondent.

OPINION

EAGLESON, J.—This case concerns the circumstances under which an employer may assert the Fourth and Fifth Amendments to the United States Constitution as defenses to judicial enforcement of an administrative agency's subpena duces tecum for records of a kind which all employers are required by law to maintain.

We first reject the employer's claim that a court order compelling compliance with the agency's subpena is an "unreasonable search and seizure" under the Fourth Amendment unless supported by "probable cause." Forty years of United States Supreme Court decisions establish that the subpenaed records need only be relevant to an authorized regulatory purpose and described with reasonable specificity. While this approach traditionally has been applied in the context of subpenaed corporate records, we see no reasoned basis for departing from precedent solely because the instant employer is an individual, rather than a corporation. Further, there is no reasonable expectation of privacy against judicially compelled disclosure of records required to be kept, and subject to administrative subpena, under a lawful regulatory scheme.

Also, consistent with the traditional exemption of "required records" from the Fifth Amendment privilege against compulsory self-incrimination, an employer must unconditionally respond to a court order enforcing an agency's subpena for wage and hour records which the employer is statutorily required to maintain. The privilege does not apply where, as here, the reporting requirement is intended to promote a legitimate regulatory aim, is not directed at activities or persons that are inherently "criminal," and only requires minimal disclosure of information of a kind customarily kept in the ordinary course of business.

The Court of Appeal therefore erred in relying on the Fourth and Fifth Amendments to reverse a court order compelling the employer to comply with the instant administrative subpena. We will reverse the judgment of the Court of Appeal.

BACKGROUND

The Division of Labor Standards Enforcement (Division) is charged with enforcing Labor Code provisions (§ 1171 et seq.)[1] and Industrial Welfare Commission (Commission) orders governing wage, hour, and working conditions of California employees. (§ 61.) The Division has broad investigatory powers (§ 1193.5) and duties (§§ 1195, 1195.5), including the power to issue subpenas compelling the attendance of witnesses and production of records. (§§ 7, 74.)[2] The statutory scheme requires "[e]very person employ-

---

[1] All further statutory references are to the Labor Code unless otherwise indicated.

[2] Section 1193.5, subdivisions (a) and (b), authorize the Division to "[i]nvestigate and ascertain" the wages, hours, and working conditions of "all employees employed in any occu-

ing labor in this state" to maintain certain employee identification and payroll records. (§ 1174, subds. (c), (d).)[3] An employer who fails or refuses to maintain and furnish these records is guilty of a misdemeanor. (§ 1175, subds. (a), (d).)[4] The Division also has a variety of means by which to enforce the substantive wage and hour provisions, including civil actions to recover unpaid wages (§§ 1193.6, 1194), actions for injunctive relief (§ 1194.5), "civil" monetary penalties (§ 1197.1), and misdemeanor sanctions (§ 1199).[5]

Here, Jay S. Bulmash (Bulmash) was appointed trustee for his sister, Serena Gluck (Gluck), and employed attendants to care for her. In February 1986, Deputy Labor Commissioner Donald C. Craib (Commissioner) issued and served[6] a subpena duces tecum directing Bulmash to appear at the Division's Santa Barbara offices one month later and to produce time and wage records, and names and addresses, for all persons employed by the trust over the previous three-year period. In an attached declaration, the Commissioner stated that the documents were needed to "verify wages and compute unpaid overtime pay for private household employees covered under Industrial Welfare Commission Order 15-80 and employed by Jay S. Bulmash as trustee for Ser[e]na B. Gluck." Order 15-80[7] requires that such records be maintained for a minimum of three years.

---

pation in the state," and to "[s]upervise the payment of unpaid minimum wages or unpaid overtime compensation owing to any employee . . . ."

Section 1195 requires the Division to "investigate" employee complaints and "take all proceedings necessary to enforce the payment of a wage not less than the minimum wage."

Section 1195.5 requires the Division, "upon request," to determine whether wages "which exceed the minimum wages fixed by the [C]ommission, have been correctly computed and paid."

Section 74 provides that, "for the purpose of enforcing [Commission] orders and provisions of this code," the Division chief "may issue subpoenas to compel the attendance of witnesses and production of books, papers, and records. Obedience to [such] subpoenas . . . shall be enforced by the courts." Section 7 allows Division deputies to exercise the subpena power.

[3] Section 1174, subdivisions (c) and (d), require all employers in California to "[k]eep a record showing the names and addresses of all employees employed and the ages of all minors," and to keep "payroll records showing the hours worked daily by, and the wages paid to, employees . . . in accordance with rules established for this purpose by the [C]ommission."

[4] Section 1175, subdivisions (a) and (d), provide that any person who "[n]eglects or refuses to furnish" this information, or "[f]ails to keep any of the records required by section 1174," is guilty of a misdemeanor.

[5] The Commissioner indicated at oral argument that, as a practical matter, the Division rarely seeks criminal prosecutions of employers for failure to keep payroll records or comply with the minimum wage.

[6] Bulmash was personally served with the subpena at a Seal Beach, California, address of unknown description. As our discussion will make clear, the fact that no other official action accompanied the act of service bears on Bulmash's Fourth Amendment claim.

[7] This order sets forth minimum wages, maximum work hours, and other conditions for persons employed in certain "household occupations." (Cal. Code Regs., tit. 8, § 11150,

After Bulmash failed to appear as requested, the Commissioner filed an unverified petition[8] in the superior court seeking to enforce the subpena. The petition alleged that the subpena and investigation were authorized under the statutory provisions cited above. According to the petition, the investigation began after a "former employee" of the trust lodged a complaint against Bulmash for "failure to pay overtime wages as required by Industrial Welfare Commission Order 15-80." In points and authorities supporting the petition, the Commissioner argued there was "probable cause" to suspect that Bulmash was "in violation of certain sections of the Labor Code [concerning] payment of wages for hours worked." The petition itself further averred that the subpenaed records were necessary to determine whether the alleged violation had occurred. No affidavits by the complaining trust employee or by Division staff members supported the foregoing statements.

In written opposition to the petition, Bulmash argued that the subpena was "overbroad," that compliance would be "burdensome," and that the records were not "relevant" to any matter pending before the Division. Bulmash also insisted that because the subpena was issued without "probable cause," court-ordered compliance would amount to an "unlawful search and seizure." After a brief hearing, the court ordered Bulmash to appear before the Commissioner and produce the subpenaed records.

On appeal, Bulmash reiterated his claim that the Fourth Amendment precluded enforcement of the subpena because no sworn factual statement establishing probable cause accompanied the Commissioner's petition. The Court of Appeal agreed and reversed the order. The court reasoned that, because "criminal" sanctions could be imposed for certain wage and hour violations, the subpena was a "search" for criminal "evidence" which must meet the standards applicable to search warrants. At the urging of both parties, the court also addressed the question whether enforcement of the subpena would violate Bulmash's Fifth Amendment privilege against compulsory self-incrimination.[9] The court answered this question in the affirmative, apparently concluding that both the contents of the records and the compulsory act of production amounted to incriminating testimony of Bulmash's failure to pay the appropriate wage.

---

subd. (1) (1986) [renumbered, Order 15-86].) As stated above, it requires that all records maintained under section 1174 be "kept on file by the employer at least three years."

[8] No contention is raised that the unverified petition was statutorily improper. (See Code Civ. Proc., § 446.) Bulmash emphasizes this fact solely for purposes of his Fourth Amendment challenge.

[9] Our record indicates that the Fifth Amendment question first appeared in this case when raised by the *Commissioner* on appeal. Since Bulmash also discussed this issue in his reply brief, the Court of Appeal addressed it in order to guide any further proceedings in the superior court. In light of this procedural posture, we will not address the Commissioner's argument here that *Bulmash* has raised this claim prematurely, in the absence of "specific questions posed to [him] in an actual legal proceeding."

DISCUSSION

A. *Fourth Amendment*

The Commissioner essentially concedes that the instant subpena fails to comply with literal Fourth Amendment requirements for a criminal warrant issued only "upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." ■ He insists, however, that judicial enforcement of the subpena is constitutionally permissible under a standard which is less exacting than that required for a search in a criminal prosecution. Based on a recent line of cases by the United States Supreme Court, we agree.

As Bulmash suggests, it was once assumed that the compulsory production of records was a "search and seizure" in the literal Fourth Amendment sense (see, e.g., *Boyd* v. *United States* (1886) 116 U.S. 616, 622 [29 L.Ed. 746, 761, 6 S.Ct. 524]), and that subpenas, like warrants, were enforceable only if issued pursuant to a formal "complaint" or at least upon probable cause to suspect "a specific breach of the law." (*Harriman* v. *Interstate Commerce Com.* (1908) 211 U.S. 407, 419-420 [53 L.Ed. 253, 263, 29 S.Ct. 115]; see also, *Jones* v. *Securities Commission* (1936) 298 U.S. 1, 25-28 [80 L.Ed. 1015, 1025-1027, 56 S.Ct. 654]; *Fed. Trade Comm.* v. *Amer. Tobacco Co.* (1924) 264 U.S. 298, 305-306 [68 L.Ed. 696, 700, 44 S.Ct. 336, 32 A.L.R. 786].)

However, it is now clear that such a restrictive view of the administrative process is not constitutionally compelled. As regulatory schemes have become increasingly important in enforcing laws designed to protect the public's health and welfare, reliance on "probable cause" as a means of restraining agency subpena power has all but disappeared. (See *United States* v. *Morton Salt Co.* (1950) 338 U.S. 632, 641-643 [94 L.Ed. 401, 410-411, 70 S.Ct. 357]; see also 1 Davis, Administrative Law Treatise (2d ed. 1978) Investigation, § 4.2, pp. 228-232.)

The Commissioner correctly argues that the leading case is *Okla. Press Pub. Co.* v. *Walling* (1946) 327 U.S. 186 [90 L.Ed. 614, 66 S.Ct. 494, 166 A.L.R. 531] (hereafter *Oklahoma Press*). There, the United States Supreme Court rejected a Fourth Amendment challenge to judicial orders enforcing administrative subpenas for payroll and sales records. The subpenas were issued by the federal wage and hour administrator to determine whether certain publishing corporations were covered under, and had violated, the Fair Labor Standards Act of 1938 (FLSA).[10] At the outset, the court observed that "no question of actual search and seizure" is raised where the

---

[10]The FLSA establishes various civil and criminal penalties for violations of wage, hour, and age limits on employment. (See 29 U.S.C. § 201 et seq.)

agency has not sought "to enter [the subpenaed parties'] premises against their will, to search them, or to seize or examine their books, records or papers without their assent, otherwise than pursuant to orders of court authorized by law and made after adequate opportunity to present objections . . . ." (327 U.S. at p. 195 [90 L.Ed. at p. 622].) The court further questioned whether the Fourth Amendment applied at all to the subpenas at bar, noting that corporate records historically had been subject to the government's "broad visitorial power." (*Id.* at pp. 204, 208 [90 L.Ed. at pp. 627, 629].)

■ Accordingly, *Oklahoma Press* articulated a test which applied Fourth Amendment requirements only by analogy. The notion that a subpena could be enforced only where a specific charge or complaint is pending was explicitly rejected. Instead, said the court, the investigation need only be for "a *lawfully authorized purpose,* within the power of [the legislative body] to command." (327 U.S. at p. 209 [90 L.Ed. at p. 630], italics added.) In addition, the requirement of " 'probable cause, supported by oath or affirmation,' literally applicable in the case of a warrant," is satisfied as long as the subpenaed documents are *"relevant"* to the inquiry. (*Ibid.,* italics added.) "Beyond this the requirement of reasonableness, including particularity in 'describing the place to be searched, and the persons or things to be seized,' also literally applicable to warrants, comes down to *specification of the documents to be produced adequate, but not excessive,* for the purposes of the relevant inquiry." (*Ibid.,* italics added.) In a later case, the court emphasized that, while the subpena may be issued and served by the agency, the subpenaed party must have the opportunity for judicial review before suffering any penalties for refusing to comply. (*See* v. *City of Seattle* (1967) 387 U.S. 541, 544-545 [18 L.Ed.2d 943, 946-947, 87 S.Ct. 1737] [in dictum].)

This test has been routinely applied by the high court to reject various Fourth Amendment challenges to official demands for records. (See, e.g., *California Bankers Assn.* v. *Shultz* (1974) 416 U.S. 21, 66-67 [39 L.Ed.2d 812, 843-844, 94 S.Ct. 1494] [upholding reasonableness of Secretary of Treasury regulations requiring banks to report certain customer transactions]; *United States* v. *Powell* (1964) 379 U.S. 48, 57 [13 L.Ed.2d 112, 119, 85 S.Ct. 248] [holding Internal Revenue Service summons for records relating to company tax returns need not be supported by probable cause to suspect fraud]; *McPhaul* v. *United States* (1960) 364 U.S. 372, 382-383 [5 L.Ed.2d 136, 144, 81 S.Ct. 138] [finding no overbreadth in congressional committee subpena despite assertion that existence of records was never established]; *United States* v. *Morton Salt Co., supra,* 338 U.S. 632, 651-653 [94 L.Ed. 401, 415-416] [finding no unreasonableness in Federal Trade Commission order for corporate reports to prove compliance with prior decree].)

More recently, the court has applied these principles to facts substantially similar to those involved here. In *Donovan* v. *Lone Steer, Inc.* (1984) 464 U.S. 408, 410-411 [78 L.Ed.2d 567, 569-570, 104 S.Ct. 769], a Department of Labor official served a subpena in the lobby of a corporation, requesting that it appear at department offices on a later date and produce "certain payroll and sales records" which it was required by law to maintain. There was no dispute that the subpenaed records, which spanned a two-year period, were relevant to an investigation authorized under the FLSA. The employer's sole claim was that enforcement would violate the Fourth Amendment because no prior judicial warrant had been obtained. The court disagreed, stating that "entry into [a] public lobby . . . for the purpose of serving an administrative subpena is scarcely the sort of governmental act which is forbidden by the Fourth Amendment." (*Id.* at p. 413 [78 L.Ed.2d at p. 572].) Because the agency had not attempted to enter nonpublic areas on the premises, the only "defenses available to [the] employer" were those set forth in *Oklahoma Press, supra,* 327 U.S. 186, "allowing him to question the reasonableness of the subpoena, before suffering any penalties for refusing to comply with it, by raising objections in an action in district court." (*Donovan, supra,* 464 U.S. at p. 415 [78 L.Ed.2d at p. 573].)

■ As we have done in prior cases, we apply the same test of "reasonableness" here. (See *Younger* v. *Jensen* (1980) 26 Cal.3d 397, 404-405 [161 Cal.Rptr. 905, 605 P.2d 813]; *Brovelli* v. *Superior Court* (1961) 56 Cal.2d 524, 529 [15 Cal.Rptr. 630, 364 P.2d 462].) The instant record reveals no official action beyond issuance and service of the subpena. The subpena itself does not authorize actual entry or immediate inspection, but merely requests future production of specific records at the Commissioner's office in another city. Thus, under *Donovan* v. *Lone Steer, Inc., supra,* 464 U.S. 408, Bulmash cannot insist upon a showing of probable cause.

To the extent Bulmash properly challenges the breadth and relevance of the subpena, these claims are not well taken. There is no dispute, of course, that the Commissioner is entitled to investigate the type of alleged wage-order violations at issue here (§§ 61, 1193.5), and that such investigations are within the power of the Legislature to command. (See *Industrial Welfare Com.* v. *Superior Court* (1980) 27 Cal.3d 690, 700-702 [166 Cal.Rptr. 331, 613 P.2d 579].) The instant subpena described the targeted records with particularity, and sought only those records which the Commissioner could minimally expect would be available in light of pertinent record keeping requirements. (§ 1174; Cal. Code Regs., tit. 8, § 11150, subd. 7.) Bulmash does not suggest, nor do we find, that these requirements facially impose an unreasonable burden on employers subject to their terms. (See 29 U.S.C. § 211(c); 29 C.F.R. §§ 516.2(a), 516.5(a) (1988) [employers subject to the FLSA must maintain employee identification, wage, and hour records for three years].) Since they reflect a three-year wage and hour history

for employees of the Gluck trust, the subpenaed records undoubtedly have some bearing on the overtime violation alleged here.

Bulmash nonetheless relies on cases upholding a form of "warrant" requirement for administrative *inspections* of residential and commercial property. (See, e.g., *Marshall* v. *Barlow's, Inc.* (1978) 436 U.S. 307, 311-315 [56 L.Ed.2d 305, 310-313, 98 S.Ct. 1816]; *See* v. *City of Seattle, supra,* 387 U.S. 541, 545-546 [18 L.Ed.2d 943, 947-948]; *Camara* v. *Municipal Court* (1967) 387 U.S. 523, 528-534 [18 L.Ed.2d 930, 935-938, 87 S.Ct. 1727].) Even in these cases, however, the "probable cause" necessary for an administrative warrant is less stringent than that required in criminal cases. (Cf. *Rush* v. *Obledo* (N.D.Cal. 1981) 517 F.Supp. 905, 916-917; *Salwasser Manufacturing Co.* v. *Municipal Court* (1979) 94 Cal.App.3d 223, 231-234 [156 Cal.Rptr. 292].) And, as explained in *Donovan* v. *Lone Steer, Inc., supra,* 464 U.S. 408, 414 [78 L.Ed.2d 567, 576], the *Barlow's-See-Camara* trio "turned upon the effort of the government inspectors to make nonconsensual entries into areas not open to the public. [Where] no such entry [i]s made[,] . . . the enforceability of [an] administrative subpoena duces tecum . . . is governed, not by our decision in *Barlow's* [*supra*, 436 U.S. 307] . . . but rather by our decision in *Oklahoma Press Publishing Co.* v. *Walling* [*supra,*] 327 U.S. 186 (1946)." Hence, Bulmash's reliance on inspection cases is misplaced.

Finally, Bulmash seeks to distinguish the cases cited by the Commissioner on grounds that they all involve *corporate* records. (See, e.g., *Donovan* v. *Lone Steer, Inc., supra,* 464 U.S. 408; *United States* v. *Morton Salt Co., supra,* 338 U.S. 632; *Oklahoma Press, supra,* 327 U.S. 186; *Brovelli* v. *Superior Court, supra,* 56 Cal.2d 524.) He suggests that the rules developed for administrative subpenas were based in part on the state's traditional "visitorial power" over corporations. Hence, he reasons, these cases do not alter the criminal probable cause standard where, as here, "private household records" of an "individual" are involved.

The Commissioner counters that it is not the identity of the subpenaed party, but the nature of the records themselves, which is dispositive. Under his view, there is a "diminished expectation of privacy" in records which are "required to be kept and subject to agency inspection."

No direct answer is provided by the pertinent authorities. Cases such as *United States* v. *Morton Salt Co., supra,* 338 U.S. 632, 652 [94 L.Ed. 401, 415-416], and *Oklahoma Press, supra,* 327 U.S. 186, 204-205 [90 L.Ed. 614, 627], indeed indicate that corporations historically have been entitled to less Fourth Amendment protection than individuals, but do not explain the extent to which this distinction influenced the *Oklahoma Press* test for subpenaed records. Also unexplained is the effect of *Katz* v. *United States*

(1967) 389 U.S. 347, 351-353 [19 L.Ed.2d 576, 581-583, 88 S.Ct. 507], which shifted Fourth Amendment focus away from a consideration of protected "areas" to the reasonableness of a particular privacy expectation. The key post-*Katz* case of *Donovan* v. *Lone Steer, Inc., supra,* 464 U.S. 408, simply rearticulated the *Oklahoma Press* rule for corporate records subpenaed in the absence of a physical search.[11]

We decline to limit *Oklahoma Press, supra,* 327 U.S. 186, in the manner urged by Bulmash. As listed in the subpena, the documents contain information presumably accumulated in the ordinary course of business, and uniformly requested of employers subject to this or analogous statutory schemes. It would be anomalous to prevent the Division from enforcing lawful wage and hour provisions through use of its authorized subpena power *solely* because the employer possessing such records is an "individual," rather than a corporation or large business. No comparable distinction is made for probable cause purposes where universal compliance with lawful building or housing codes is at stake. And, in the few cases involving subpenas directed at individuals under circumstances similar to this case, it was simply assumed that the *Oklahoma Press* test applied. (See *I. C. C.* v. *Gould* (3d Cir. 1980) 629 F.2d 847, 851, cert. den. 449 U.S. 1077 [66 L.Ed.2d 800, 101 S.Ct. 856] [sole proprietor]; *Provenzano* v. *Porter* (9th Cir. 1946) 159 F.2d 47, 48, cert. den. 331 U.S. 816 [91 L.Ed. 1834, 67 S.Ct. 1303] [sole proprietor].)

In any event, we agree with the Commissioner that no Fourth Amendment "privacy" claim can be asserted against an administrative subpena limited to the production of records which the subpenaed party is required to maintain, for the express purpose of agency inspection, under lawful statutes or regulations. In such cases, Fourth Amendment defenses to the subpena are those set forth in *Oklahoma Press, supra,* 327 U.S. 186.

Accordingly, we hold that the Fourth Amendment does not prohibit judicial enforcement of the instant administrative subpena. The Court of Appeal erred in reversing the order compelling compliance on this ground.[12]

---

[11] The Commissioner cites some cases which *do* discuss Fourth Amendment privacy expectations with regard to records kept pursuant to administrative mandate, but they are of little help here. (See *McLaughlin* v. *Kings Island* (6th Cir. 1988) 849 F.2d 990; *McLaughlin* v. *A.B. Chance Co.* (4th Cir. 1988) 842 F.2d 724; *Brock* v. *Emerson Elec. Co., Electronic & Space Div.* (11th Cir. 1987) 834 F.2d 994.) These cases not only reach divergent results under the same basic facts and worker-safety regulation, but also concern inspections of records conducted on private commercial *premises* in the absence of a warrant *or* subpena.

[12] Bulmash alternatively argues that probable cause in the criminal sense is required to enforce this subpena under article I, section 13 of the California Constitution, which prohibits "unreasonable seizures and searches." We disagree. Having reviewed the case authorities addressing this argument under the Fourth Amendment, we find them persuasive in disposing of Bulmash's state constitutional claim. (See also *Paladini* v. *Superior Court* (1918) 178 Cal. 369, 373 [173 P. 588].)

## B. *Fifth Amendment*

■ Bulmash argues that, since the instant records could facially disclose noncompliance with wage and hour laws, the Fifth Amendment is a complete defense to court-ordered compliance with the subpena. ■ ■ ■ ■ ■ He insists that all prerequisites for asserting the privilege are present, i.e., he is an individual[13] who has been statutorily compelled to make incriminating statements[14] which the Division could conceivably use as a basis for imposing civil and/or criminal penalties. Even though the Division does not yet have the records, and has not attempted to sanction Bulmash for substantive wage and hour violations, Bulmash alternatively

---

[13] The Fifth Amendment states, in pertinent part, that no "person" shall "be compelled in any criminal case to be a witness against himself." It has long been clear that this privilege belongs only to individuals. (*Braswell* v. *United States* (1988) 487 U.S. 99, 105-116 [101 L.Ed.2d 98, 106-113, 108 S.Ct. 2284].) A person compelled to produce records which belong to another entity and which he holds in a "representational capacity" may not assert the privilege for himself, even though compliance may incriminate him. (*Id*. at p. 110 [101 L.Ed.2d at p. 109.) The Commissioner insists that this rule applies to Bulmash, because he was obligated to prepare and maintain the instant employment records in his capacity as trustee for the Gluck trust. We decline to address this narrow question. The abbreviated record in this case contains insufficient evidence from which to assess Bulmash's legal capacity and obligations with regard to his sister.

[14] It is well settled that a person can assert the privilege only to prevent "being incriminated by his own compelled testimonial communications." (*Fisher* v. *United States* (1976) 425 U.S. 391, 409 [48 L.Ed.2d 39, 55, 96 S.Ct. 1569].) The contents of subpenaed business records which have been *voluntarily* prepared are not privileged, because they were not made under compulsion. (*United States* v. *Doe* (1984) 465 U.S. 605, 610-611 [79 L.Ed.2d 552, 558-559, 104 S.Ct. 1237].) Bulmash attempts to distinguish his case on grounds that creation of wage and hour records is *compelled* by section 1174. However, as we will make clear, a special analysis for "required records" precludes a finding of privilege.

Bulmash also insists that producing the records under compulsion of the subpena constitutes an incriminating, testimonial, and privileged *act*. The Court of Appeal agreed. It cited statements made in *Fisher, supra,* 425 U.S. at page 410 [48 L.Ed.2d at pages 55-56], and repeated in *Doe, supra,* 465 U.S. at page 613 [79 L.Ed.2d at page 560], that such compliance may be privileged because it "tacitly concedes" that the papers exist, that the subpenaed party possesses them, and that they are authentic. However, these cases made clear that the court was not referring to statutorily "required records." (*Fisher, supra,* at p. 410, fn. 11 [48 L.Ed.2d at p. 55]; *Doe, supra,* at p. 607, fn. 3 [79 L.Ed.2d at p. 557].) And, no high court case specifically addressing required records has distinguished between their *contents* and the *act* of production for purposes of determining whether the privilege applies. In any event, since section 1174 requires that the subpenaed wage and hour records be kept for inspection, the Division already assumes that the papers exist, that Bulmash possesses them, and that they are authentic.

We also reject Bulmash's related claim that enforcement of the subpena may compel him to explicitly or implicitly reveal that he has *not* kept the records as required by law. While the nonkeeping of records may indeed incriminate an employer (§ 1175), simple logic precludes us from finding that the act of *not* writing or preparing documents (i.e., no act) is "testimonial" in the constitutional sense. (See generally *Schmerber* v. *California* (1966) 384 U.S. 757, 765 [16 L.Ed.2d 908, 916-917, 86 S.Ct. 1826] ["Since the blood test evidence, although an incriminating product of compulsion, was neither petitioner's testimony nor evidence relating to some communicative act or writing by the petitioner, it was not inadmissible on privilege grounds."].)

insists that the Division must promise not to use the records in any possible, future criminal prosecution.

The Commissioner counters that the privilege simply does not apply where, as here, the subpenaed records are required to be kept pursuant to this kind of lawful regulatory scheme. He relies on a line of cases beginning with *Shapiro* v. *United States* (1948) 335 U.S. 1 [92 L.Ed. 1787, 68 S.Ct. 1375].

In *Shapiro,* regulations issued under the Emergency Price Control Act literally required the keeping and disclosure of sales records of a kind " 'customarily kept' " in the course of business. (335 U.S. at p. 5, fn. 3 [92 L.Ed. at p. 1792] [citations omitted].) A wholesaler complied with an administrative subpena for such records, but claimed, among other things, that the privilege applied. He was subsequently convicted under the act. The United States Supreme Court rejected his Fifth Amendment claim, stating that the privilege "cannot be maintained in relation to *'records required by law to be kept* in order that there may be suitable information of transactions which are the appropriate subjects of governmental regulation and the enforcement of restrictions validly established.' " (*Id*. at p. 33 [92 L.Ed. at p. 1807], quoting dictum originally from *Wilson* v. *United States* (1911) 221 U.S. 361, 380 [55 L.Ed. 771, 779, 31 S.Ct. 538], italics added.) *Shapiro* also noted that the privilege traditionally has not been applied to public records, and that records kept under the act undoubtedly had " 'public aspects.' " (335 U.S. at p. 34 [92 L.Ed. at p. 1808], quoting *Davis* v. *United States* (1946) 328 U.S. 582, 602 [90 L.Ed. 1453, 1464, 66 S.Ct. 1256] (dis. opn. of Frankfurter, J.).)

The high court has since declined various opportunities to reexamine this "required records doctrine." (See, e.g., *Spevack* v. *Klein* (1967) 385 U.S. 511, 516-517 [17 L.Ed.2d 574, 578-579, 87 S.Ct. 625].) The court has upheld some Fifth Amendment challenges to mandatory reporting laws, but only after finding that *Shapiro, supra,* 335 U.S. 1, did not apply.

For example, in *Marchetti* v. *United States* (1968) 390 U.S. 39, 60-61 [19 L.Ed.2d 889, 905, 88 S.Ct. 697], the court held that the privilege was a complete defense to prosecution for noncompliance with federal tax and registration requirements on illegal gambling. In the court's view, the disclosure scheme created an impermissible and "substantial" risk of self-incrimination, because it required that lists of gambler-taxpayers be furnished to interested prosecutorial agencies. (*Id*. at pp. 53, 61 [19 L.Ed.2d at pp. 900-901, 905].) The court distinguished *Shapiro, supra,* 335 U.S. 1, primarily on grounds that "the [reporting] requirements at issue [there] were imposed in 'an essentially non-criminal and regulatory area of inquiry' while those here are directed to a 'selective group inherently suspect of criminal

activities.'" (390 U.S. at p. 57 [19 L.Ed.2d at p. 903] [citation omitted].) *Marchetti* also observed that, unlike the price act in *Shapiro,* the wagering scheme did not involve records of a kind that were " 'customarily kept' " by the targeted group. (*Ibid.*) Finally, the court stated, "whatever 'public aspects' there were to the records at issue in *Shapiro,* there are none to the information demanded from Marchetti." (*Ibid.*) The court declined to impose a use restriction on the suspect information, noting that such a result would contravene Congress's clear intent.

The same analysis was used to reach similar results in two cases decided the same day as *Marchetti.* (*Grosso* v. *United States* (1968) 390 U.S. 62, 64-69 [19 L.Ed.2d 906, 88 S.Ct. 709] [federal registration and taxation of illegal gambling]; *Haynes* v. *United States* (1968) 390 U.S. 85, 95-100 [19 L.Ed.2d 906, 923, 88 S.Ct. 722] [federal registration and taxation of firearms typically used to commit crimes]; see also *Leary* v. *United States* (1969) 395 U.S. 6, 12-29 [23 L.Ed.2d 57, 68-78, 89 S.Ct. 1532] [federal registration and taxation of illegal marijuana transfers].)

More recently, in *California* v. *Byers* (1971) 402 U.S. 424 [29 L.Ed.2d 9, 91 S.Ct. 1535], a majority of the court refused to apply the privilege in a misdemeanor prosecution for noncompliance with a California Vehicle Code section requiring a driver involved in an accident to stop and identify himself. In a plurality opinion joined by three other justices, Chief Justice Burger perceived the task as one of "balancing the public need" for disclosure against "the individual claim to constitutional protections." (*Id.* at p. 427 [29 L.Ed.2d at p. 17].) The plurality found no "substantial" risk of self-incrimination within the meaning of the *Marchetti-Grosso-Haynes* trio (cited *ante,* at pp. 487-488) for the following reasons: Although the Vehicle Code defined some criminal offenses, the hit-and-run law was intended to promote driver financial responsibility, not to facilitate criminal convictions. The group targeted by the law—all drivers in the state—was neither highly selective nor inherently suspect of criminal conduct. The regulated activities—driving a car and being in an accident—were not inherently unlawful. In short, the statute was "indispensable" to implementing an "essentially regulatory" goal. (*Byers, supra,* 402 U.S. at pp. 430-431 [29 L.Ed.2d at p. 19].)

In a concurring opinion, Justice Harlan expressed concern that the privilege might impair the state's dual interest in ensuring financial responsibility *and* deterring dangerous driving through criminal sanctions. He answered the key question—whether "some sort of immunity is required as a condition of compelled self-reporting"—in the negative. (*Byers, supra,* 402 U.S. at p. 454 [29 L.Ed.2d at p. 32].) Justice Harlan explained that the *Marchetti-Gross-Haynes* line of cases, which he authored, involved registration laws which focused almost exclusively on conduct which was criminal. "In con-

trast," he observed, "the 'hit and run' statute [in *Byers*] predicates the duty to report on the occurrence of an event which cannot, without simply distorting the normal connotations of language, be characterized as 'inherently suspect' . . . . And, having initially specified the regulated event— i.e., an automobile accident involving property damage—in the broadest terms possible consistent with the regulatory scheme's concededly noncriminal purpose, the State has confined the portion of the scheme now before us . . . to the minimal level of disclosure . . . ." (402 U.S. at p. 456 [29 L.Ed.2d at p. 34].)

The lower federal courts continue to apply the "required records doctrine" of *Shapiro, supra,* 335 U.S. 1, while distinguishing *Marchetti, supra,* 390 U.S. 39, and its progeny. (See, e.g., *Grand Jury Subpoena Duces Tecum, Underhill* (6th Cir. 1986) 781 F.2d 64, 67-69, cert. den. 479 U.S. 813 [93 L.Ed.2d 23, 107 S.Ct. 64]; *In re Grand Jury Subpoena to Custodian of Records, etc.* (6th Cir. 1974) 497 F.2d 218, 220-221, cert. den. 419 U.S. 1009 [42 L.Ed.2d 283, 95 S.Ct. 328]; *United States* v. *Resnick* (5th Cir. 1974) 488 F.2d 1165, 1168, cert. den. 416 U.S. 991 [40 L.Ed.2d 769, 94 S.Ct. 2400].) And, following the lead of *Byers, supra,* 402 U.S. 424, several cases have allowed the mandatory disclosure of information which, on its face, could implicate the reporter in criminal conduct. (See, e.g., *United States* v. *Alkhafaji* (6th Cir. 1985) 754 F.2d 641, 646-648 [duty under the Gun Control Act of 1968 to report delivery of firearms to common carrier even though transporting firearms may be unlawful]; *United States* v. *Dichne* (2d Cir. 1979) 612 F.2d 632, 638-641, cert. den. 445 U.S. 928 [63 L.Ed.2d 760, 100 S.Ct. 1314] [duty under the Bank Secrecy Act to disclose export of monetary instruments even though money may be stolen]; *United States* v. *Stirling* (2d Cir. 1978) 571 F.2d 708, 727-728, cert. den. 439 U.S. 824 [58 L.Ed.2d 116, 99 S.Ct. 93] [duty under the Securities Act of 1933 to disclose details of stock transactions which were unlawful].)

The same approach leads us to reject Bulmash's Fifth Amendment challenge to judicial enforcement of the Commissioner's subpena. As contemplated by *Shapiro, supra,* 335 U.S. 1, 33 [92 L.Ed. 1787, 1807], the information required by section 1174 is the "appropriate" subject of a lawful regulatory scheme. The reporting law is obviously intended to encourage voluntary compliance with minimum labor standards designed for the *mutual* benefit of employees *and* employers. Such standards are enforced, not with an aim to punish, but to "ensure employees are not required or permitted to work under substandard unlawful conditions, and to protect employers who comply with the law from those who attempt to gain competitive advantage at the expense of their workers . . . ." (§ 90.5, subd. (a).) Work conditions, and the integrity of the employment market, are concerns which cut to the core of the state's police power.

To this end, section 1174 defines the regulated act and class in the broadest possible terms. The statute applies to "[e]very person employing labor in this state" (*ibid.*), a group which cannot be viewed as highly selective or inherently suspected of criminal conduct. It is the employment of labor, not the violation of employment laws, which triggers the duty to report. This activity cannot be reasonably characterized as inherently suspect. We also note that this case does not involve the use of ostensibly regulatory reporting requirements to discover unrelated criminal conduct. (Cf. *Garner* v. *United States* (1976) 424 U.S. 648 [47 L.Ed.2d 370, 96 S.Ct. 1178].)

Consistent with this statutory theme of statewide, uniform regulation is the significant number of "civil" enforcement techniques available to ensure employees receive the minimum wage under proper working conditions. (See, e.g., §§ 1193.6, 1194, 1194.5, 1197.1.) These provisions, which seek to recover wages due and/or encourage continuing compliance with the law, would be rendered completely ineffectual were the state foreclosed from compelling the type of information sought here. Section 1174 requests the minimum amount of data necessary to implement the scheme's regulatory aim.

While the high court has placed less emphasis on other features of the "required records doctrine," the instant subpenaed records undoubtedly contain information of a kind "customarily kept" by employers and having "public aspects." (See *Shapiro, supra,* 335 U.S. at pp. 5, 34 [92 L.Ed. at pp. 1792, 1808].) This data occupies a basic role in any employer's accounting practices, and must be regularly summarized in payroll statements provided to employees. (§ 226, subd. (a).)

We therefore hold that the privilege does not apply to the instant subpena for records required to be maintained and produced under section 1174.[15]

---

[15] Bulmash also asserts that unconditional enforcement of this administrative subpena violates California's constitutional prohibition against compulsory self-incrimination. (Cal. Const., art. I, § 15.) However, our approach is consistent with prior treatment of the state constitutional privilege.

In *Paladini* v. *Superior Court, supra,* 178 Cal. 369, the "state market director" obtained a court order compelling compliance with an authorized subpena for records which petitioners were required to produce under a scheme regulating the fishing industry. (Stats. 1917, ch. 803, § 26, subds. (a), (b), pp. 1680-1681.) The director was authorized to use the records in "investigations concerning all matters" under the act, including license-revocation inquiries. (*Ibid.*; see also § 6, p. 1675; *Palidini, supra,* at pp. 372-373.) Even though violations of *several other sections* of the act were "misdemeanor[s]" made expressly "punishable" by fine and/or imprisonment (Stats. 1917, ch. 803, § 27, p. 1681), this court concluded that administrative proceedings thereunder were "not criminal" in nature, and rejected petitioners' claim that enforcement of the subpena violated the state constitutional prohibition against compelled self-incrimination. (*Paladini, supra,* at p. 373.)

Here, the dissenting justices present no persuasive reason for departing from *Paladini* at this late date. For purposes of Bulmash's federal *and* state constitutional claims, the instant subpena seeks records which are "indispensable" to implementing an "essentially regulato-

The judgment of the Court of Appeal is reversed.

Lucas, C. J., Panelli, J., and Kennard, J., concurred.

**MOSK, J.,** Concurring and Dissenting.—Although I agree with the majority that the subpoena in this case did not violate the Fourth Amendment of the United States Constitution or article I, section 13, of the California Constitution (*Brovelli* v. *Superior Court* (1961) 56 Cal.2d 524, 529 [15 Cal.Rptr. 630, 364 P.2d 462]), I cannot join them in importing the questionable federal required-records exception into our state constitutional privilege against self-incrimination.

Once again, the majority have construed the state constitutional privilege against self-incrimination narrowly and begrudgingly, treating it as a historic relic to be, at most, merely tolerated. (See *People* v. *May* (1988) 44 Cal.3d 309, 323 [243 Cal.Rptr. 369, 748 P.2d 307] (dis. opn. of Mosk, J.), quoting *Quinn* v. *United States* (1955) 349 U.S. 155, 162 [99 L.Ed. 964, 972, 75 S.Ct. 668, 51 A.L.R.2d 1157].) I dissent because the fundamental protections afforded by the California Declaration of Rights (Cal. Const., art. I) are more than mere antiquities which can be readily discarded in favor of the more limited protections provided by federal authority.

In relegating the discussion of Bulmash's state constitutional claims to the ultimate footnote (*ante,* p. 490, fn. 15), the majority have abdicated their judicial obligation to independently determine matters of state law and have impermissibly resolved Bulmash's state constitutional claim by a simple, mechanical invocation of current federal precedent. (*People* v. *Chavez* (1980) 26 Cal.3d 334, 352 [161 Cal.Rptr. 762, 605 P.2d 401].)[1] However, it is incontrovertible that the California Constitution is, and always has been, a document of independent force which is the first line of protection for the

---

ry" goal. (*Byers, supra,* 402 U.S. at pp. 430-431 [29 L.Ed.2d at pp. 18-19]; see also conc. opn. of Harlan, J. at p. 456 [29 L.Ed.2d at pp. 33-34].)

[1] The majority's casual reliance on a case decided seven decades ago, *Paladini* v. *Superior Court* (1918) 178 Cal. 369 [173 P. 588], is clearly inapposite. In that case Paladini did not claim, as Bulmash does here, that *compliance* with the state market director's administrative subpoena might reveal criminal conduct. Instead he argued that he was not obligated to comply with the subpoena because the license revocation proceeding was essentially criminal. The court rejected this claim by stating, "the proceeding before the state market director is not criminal in its nature, and the order compelling the petitioner to produce their books before the state market director was not in violation of the constitutional provision which prohibits a court or officer from requiring a defendant *in a criminal case* to furnish evidence against himself." (*Paladini* v. *Superior Court, supra,* 178 Cal. at p. 374 (italics added).) As should be obvious, this is currently an incorrect statement of the law, and the privilege against self-incrimination indeed applies to *any* proceeding in which the witness's testimony may tend to incriminate him. (*People* v. *Rucker* (1980) 26 Cal.3d 368, 378 [162 Cal.Rptr. 13, 605 P.2d 843], citing *Lefkowitz* v. *Turley* (1973) 414 U.S. 70, 77 [38 L.Ed.2d 274, 281, 94 S.Ct. 316].) Nonetheless, the majority rely on this outdated statement in a vain attempt to find a California case that is consistent with the federal required-records exception.

individual against the excesses of state officials. (*People* v. *Brisendine* (1975) 13 Cal.3d 528, 549-550 [119 Cal.Rptr. 315, 531 P.2d 1099].)

In interpreting the scope of the fundamental liberties protected by the California Declaration of Rights, we sit as the court of last resort, and guard the full panoply of rights Californians have come to expect as their due.[2] (*People* v. *Longwill* (1975) 14 Cal.3d 943, 951, fn. 4 [123 Cal.Rptr. 297, 538 P.2d 753].) Consequently, the construction of a provision of our state Constitution remains a matter of California law regardless of the narrower interpretation of similar provisions in the federal Constitution. Our charter specifically provides that rights guaranteed in our state Constitution are not dependent on those guaranteed by the federal charter. (Cal. Const., art. I, § 24; *People* v. *Pettingill* (1978) 21 Cal.3d 231, 247-248 [145 Cal.Rptr. 861, 578 P.2d 108].)

Unfortunately, there are those who are not convinced that our state Constitution means what it says in article I, section 24, and that it is a document of independent force. As a result the majority here continue a disturbing trend of leaving the interpretation of our state Constitution to the judicial guardians of the United States Constitution—a task that frequently produces diminishing individual protections.

Article I, section 15, of the California Constitution commands that an individual cannot be compelled to be a witness against himself in a criminal case. In the past we have broadly construed the privilege and have been solicitous in protecting this fundamental constitutional right. (*Reynolds* v. *Superior Court* (1974) 12 Cal.3d 834, 842-843 [117 Cal.Rptr. 437, 528 P.2d 45].) Indeed, there can be no doubt that the state constitutional privilege against self-incrimination assures greater protections for individuals than those provided by the federal Constitution. (See, e.g., *People* v. *Rivera* (1985) 41 Cal.3d 388, 395 [221 Cal.Rptr. 562, 710 P.2d 362]; *In re Misener* (1985) 38 Cal.3d 543, 550 [213 Cal.Rptr. 569, 698 P.2d 637]; *People* v. *Pettingill, supra,* 21 Cal.3d 231, 251; *Reynolds* v. *Superior Court, supra,* 12 Cal.3d 834, 842-843.)

In light of these greater protections, I cannot join the majority in adopting exceptions which denigrate the basic purpose of the privilege against self-incrimination. The privilege reflects the framers' opposition to the unlimited power of the government and manifests our unwillingness to subject those suspected of a crime " 'to the cruel trilemma of self-accusation, perjury or contempt.' " (*Ramona R.* v. *Superior Court* (1985) 37 Cal.3d 802, 809-810 [210 Cal.Rptr. 204, 693 P.2d 789], quoting *Murphy* v. *Waterfront*

---

[2] This is not the first time defendant Bulmash has relied on state authority. He did so successfully in a different context, resulting in a unanimous decision in *Bulmash* v. *Davis* (1979) 24 Cal.3d 691 [157 Cal.Rptr. 66, 597 P.2d 469].

*Comm'n.* (1964) 378 U.S. 52, 55 [12 L.Ed.2d 678, 681, 84 S.Ct. 1594].) The privilege is inherent in our adversary system of criminal justice and recognizes that such a system is undermined when the People, despite their superior investigative and prosecutorial powers, avoid the burdens of independent investigation by compelling the accused to prove the charge against him out of his own mouth. (*In re Misener, supra,* 38 Cal.3d at pp. 551-552.) Consequently, unless and until a witness in any official proceeding is protected against the use of his compelled answers and their fruits in any subsequent criminal prosecution, the state constitutional privilege against self-incrimination allows him to refuse to answer any question or to produce any material which may reveal potentially incriminating information. (See *Daly* v. *Superior Court* (1977) 19 Cal.3d 132, 142-143 [137 Cal.Rptr. 14, 560 P.2d 1193].)

In an effort to safeguard this fundamental privilege, we have traditionally resolved the conflict between the state's desire to obtain information and the individual's right to be free from self-incrimination by providing the individual with use immunity for any self-incriminating statements made in a civil or administrative proceeding. (See, e.g., *Lybarger* v. *City of Los Angeles* (1985) 40 Cal.3d 822, 827 [221 Cal.Rptr. 529, 710 P.2d 329]; *Ramona R.* v. *Superior Court, supra,* 37 Cal.3d 802, 809-810; *People* v. *Coleman* (1975) 13 Cal.3d 867, 889 [120 Cal.Rptr. 384, 533 P.2d 1024]; *People* v. *Superior Court (Kaufman)* (1977) 12 Cal.3d 421, 428-429 [115 Cal.Rptr. 812, 525 P.2d 716]; *Byers* v. *Justice Court* (1969) 71 Cal.2d 1039, 1056-1057 [80 Cal. Rptr 553, 458 P.2d 465], vacated on other grounds in *California* v. *Byers* (1971) 402 U.S. 424 [29 L.Ed.2d 9, 91 S.Ct. 1535].)[3] Such an accommodation is eminently reasonable in this case, and Bulmash should be ordered to comply with the subpoena only if he is assured that the People will not use the material he is requested to produce as evidence against him in any subsequent criminal prosecution. Use immunity would protect Bulmash's privilege against self-incrimination without impairing the Labor Commissioner's effective enforcement of the Labor Code. (*Ante,* p. 479, fn. 5.)

The majority nevertheless eschew this reasonable accommodation, and instead force Bulmash to disclose information that could reveal misdemeanor violations of the Labor Code without providing him any protection from prosecution. The majority do so by relying on *Shapiro* v. *United States*

---

[3] In concluding that use immunity was compelled by the privilege against self-incrimination, this court defined the scope of the privilege as set forth in article I, section 15, of the California Constitution and codified in Evidence Code section 940. Because section 940, as construed by the courts of this state, establishes the requirement for use immunity as a statutory rule relating to the substantive law of the privilege against self-incrimination, it is specifically exempted from the so-called "Truth in Evidence" section of our state Constitution. (Cal. Const., art. I, § 28, subd. (d); *People* v. *Weaver* (1985) 39 Cal.3d 654, 659 [217 Cal.Rptr. 245, 703 P.2d 1139].)

(1948) 335 U.S. 1 [92 L.Ed. 1787, 68 S.Ct. 1375], a case which the Supreme Court itself has not explicitly followed since its pronouncement. Indeed, the majority's discussion of cases which concededly do *not* apply the required-records exception (*ante,* pp. 487-489), impliedly recognizes that the rule announced in *Shapiro* is of questionable vitality. Nonetheless, the majority engraft this exception onto our own state Constitution.

In the absence of the most compelling justification I do not believe we should adopt an exception which compels Bulmash to surrender the very protection the privilege against self-incrimination was designed to guarantee. The fact that the government need only require records to be kept in order to demand incriminating disclosures is merely a description of what is attempted, not a rationale for obviating the privilege against self-incrimination. "The notion that because a disclosure is required the privilege does not apply, if extended to its full logical reach, is capable of entirely destroying the privilege." (Mansfield, *The Albertson Case: Conflict Between the Privilege Against Self-Incrimination and the Government's Need for Information,* 1966 Sup.Ct.Rev. 103, 148-149.)

The defendant in a criminal trial "has an absolute, unqualified right to compel the State to investigate its own case, find its own witnesses, . . . and convince a jury through its own resources." (*In re Misener, supra,* 38 Cal.3d 543, 556, quoting *Williams* v. *Florida* (1970) 399 U.S. 78, 112 [26 L.Ed.2d 446, 483, 90 S.Ct. 1893] (conc. and dis. opn. of Black, J.).) Rather than creating exceptions to that basic right, I believe that if Bulmash is to be prosecuted for violations of the Labor Code the Labor Commissioner should obtain evidence of his crime through the time-honored method of independent investigation. I therefore dissent.

Broussard, J., concurred.

**KAUFMAN, J.,** Concurring and Dissenting.—"If we are to continue a government of limited powers, [ ] agencies of regulation must themselves be regulated . . . . The rights of the citizen against them must be made plain." (Root, *Public Service By the Bar* (1916) 2 A.B.A. J. 736, 750.)

I reluctantly concur in the conclusion that the subpena enforcement order does not violate the Fourth Amendment to the United States Constitution, because I recognize there is no reasonable expectation of privacy as to records that are required to be made and maintained for inspection by a regulatory agency. However, I respectfully dissent from the holding of the majority as to defendant's Fifth Amendment claim. Although the United States Supreme Court has held that the Fifth Amendment to the Constitution of the United States does not apply when a regulatory agency subpenas an individual's records which may provide self-incriminating evidence (*Sha-*

*piro* v. *United States* (1947) 335 U.S. 1 [92 L.Ed. 1787, 68 S.Ct. 1375]), I am not persuaded that the analysis and reasoning of that decision is sound. Thus, in my view we should invoke the authority of article I, section 15 of our state Constitution and provide greater protection against self-incrimination than that provided by the wartime influenced, result-oriented *Shapiro* case.

While I recognize the state's need to verify compliance with valid police power regulations, I am troubled that, in many cases, the *Shapiro* rule gives regulatory agencies virtually the unchallengeable power to enforce its regulations by criminal prosecution based on compelled self-disclosure. It is wholly contrary to the state and federal guaranties against compelled self-incrimination to allow government the unbridled authority to compel an individual to provide self-incriminating testimonial evidence without at the same time preventing its use as evidence in the prosecution of that individual for any crimes disclosed therein. Accordingly, I would order defendant to produce the records the Division of Labor Standards Enforcement (Division) seeks to carry out its regulatory function, but require the government to forego their use in any subsequent criminal prosecution.

The principles which underlie the privilege against self-incrimination are deep and longstanding. "The privilege . . . prevents the debasement of the citizen which would result from compelling him to 'accuse' himself before the power of the state. The roots of the privilege are deeper than the rack and the screw used to extort confessions. They go to the nature of a free man and his relationship to the state." (*United States* v. *Wade* (1967) 388 U.S. 218, 261 [18 L.Ed.2d 1149, 1176-1177, 87 S.Ct. 1926] [conc. and dis. opn. of Fortas, J.].) Indeed, the privilege has long been considered fundamental to the values upon which our nation was founded. "[A]ny compulsory discovery by . . . compelling the production of [a party's] private books and papers to convict him of crime . . . is abhorrent to the instincts of an American. It may suit the purposes of despotic power; but it cannot abide the pure atmosphere of political liberty and personal freedom." (*Boyd* v. *United States* (1886) 116 U.S. 616, 631-632 [29 L.Ed. 746, 751, 6 S.Ct. 524].) Further, the privilege has been considered an important device to ensure complete and accurate investigation of suspected criminal activity. " 'The real objection is that any system of administration which permits the prosecution to trust habitually to compulsory self-disclosure as a source of proof must itself suffer morally thereby. The inclination develops to rely mainly upon such evidence, and to be satisfied with an incomplete investigation of other sources. The exercise of the power to extract answers begets a forgetfulness of the just limitations of that power.' " (8 Wigmore, Evidence (McNaughton ed. 1961) § 2251, p. 296, fn. 1, italics omitted.)

Moreover, *Shapiro*'s required-records doctrine poses an extreme danger of governmental abuse. "The doctrine invites the government to require

individuals to keep the kinds of records it most wants to subpoena and to claim that these 'required records' are not privileged, thereby circumventing constitutional limitations on compulsory record-keeping and production of documents." (Saltzburg, *The Required Records Doctrine: Its Lessons for the Privilege Against Self-Incrimination* (1986) 53 U.Chi.L.Rev. 6, 10 [hereafter Saltzburg].) The "protection against compulsory self-incrimination, guaranteed by the Fifth Amendment, is nullified to whatever extent [the *Shapiro* majority] holds that [government] may require a citizen to keep an account of his deeds and misdeeds and turn over or exhibit the record on demand of government inspectors, who then can use it to convict him. . . . It would, no doubt, simplify enforcement of all criminal laws if each citizen were required to keep a diary that would show where he was at all times, with whom he was, and what he was up to." (*Shapiro, supra,* 335 U.S. at pp. 70-71 [92 L.Ed. at pp. 1826-1827] [dis. opn. of Rutledge, J.].)

Three facts pervade this case which are, in my view, dispositive: First, by statute it is a criminal offense to (a) fail to pay minimum wage or overtime premium as established by the Industrial Welfare Commission (Lab. Code, § 1199, subds. (b), (c));[1] (b) fail or refuse to produce employee wage and hour records as required by the Division (§ 1175, subd. (a)); and (c), fail to keep employee wage and hour records as required by section 1174 (§ 1175, subd. (d)). Second, in support of its motion to compel production of defendant's employee wage and hour records, the Division submitted a declaration "alleg[ing] that [defendant] is probably in violation of certain sections of the labor code with respect to payment of wages for hours worked by [defendant's] employees . . . ." Third, the Division has throughout these proceedings attempted to justify compelling the production of defendant's employee wage and hour records on the ground that its ability to obtain these records enhances the performance of its regulatory function. As I explain below, since the Division seeks to compel defendant to provide records that likely prove the elements of several misdemeanors the Division believes he has committed, if the purpose of requiring production of the records is truly regulatory the government ought to be willing to and should be required to forego the use of such records in any subsequent criminal prosecution.

The majority decision incorporates into California law the "required records doctrine" of *Shapiro,* a judicially created exception to the privilege against compelled self-incrimination, and by so doing denigrates the privilege and the principles upon which it is based. Such a decision, in my view, is unnecessary, unwarranted and ill-advised. As the Division averred at oral argument, criminal prosecution for failure to create and retain the wage and hour records (§ 1174) or to pay prescribed wages (§ 1199) is rarely pursued (see maj. opn., *ante,* fn. 5 at p. 479). Thus, criminal prosecution is apparent-

---

[1] All further statutory references are to the Labor Code unless otherwise indicated.

ly not essential to enforcement of the wage and hour laws. If criminal prosecution is not necessary in this case to accomplish the valid regulatory purpose of the wage and hour laws, then elimination of the privilege against self-incrimination in the regulatory context is wholly unwarranted. Just as important, by authorizing government compulsion to produce employment records without delimiting their use to noncriminal regulatory purposes, the majority encourages individuals such as defendant to "lose" such wage and hour records to avoid self-incrimination, and thus make it difficult, if not impossible, for it to carry out its regulatory purposes.

Clearly, the majority presents defendant with the "cruel trilemma of self-accusation, perjury or contempt." (*Murphy* v. *Waterfront Comm'n.* (1964) 378 U.S. 52, 55 [12 L.Ed.2d 678, 681, 84 S.Ct. 1594].) Defendant may comply with the subpena, which may well establish the essential elements of a misdemeanor, i.e., violation of wage and hour laws; or he may confess that he either never created, or has since disposed of, the records required by section 1174, itself a misdemeanor (§ 1175); or he may lie and risk prosecution for perjury, perhaps asserting the records were lost, misplaced or destroyed, and then assert the privilege against compelled oral testimony (see, e.g., *Curcio* v. *United States* (1957) 354 U.S. 118, 124 [1 L.Ed.2d 1225, 1230, 77 S.Ct. 1145]; *United States* v. *Daisart Sportswear* (2d Cir. 1948) 169 F.2d 856, 862 [oral testimony as to content of lost or destroyed records may not be compelled], revd. on other grounds *sub nom. Smith* v. *United States* (1949) 337 U.S. 137 [93 L.Ed. 1264, 69 S.Ct. 1000]); or he may refuse to comply with the subpena, which subjects him to charges of contempt. It is a cruel irony that while the possibility of criminal prosecution is apparently not essential to enforce the wage and hour regulatory scheme, the possibility of criminal prosecution, indeed multiple prosecutions, based on what the compelled production of the records may disclose, virtually assures noncompliance with the only elements of the scheme that *are* essential to the Division's regulatory function—the keeping of records and reporting. If the Division's objective is truly regulatory enforcement of the wage and hour laws, as opposed to punishing their violation, we should enforce the subpena and confer use immunity on the contents of the records thus obtained rather than adopt *Shapiro*'s required-records doctrine.

In *Shapiro,* the United States Supreme Court was called upon to determine the scope of the immunity provisions of the Emergency Price Control Act (50 U.S.C., Appen. § 922(g)), which provided that the immunity provisions of the Compulsory Testimony Act of February 11, 1893 (27 Stat. 443, former 49 U.S.C. § 46 (1934 ed.)) would govern. The Court determined that immunity would apply only to evidence covered by the privilege against self-incrimination, a reasonable result. Relying upon dictum in *Wilson* v. *United States* (1911) 221 U.S. 361, 380 [55 L.Ed. 771, 779, 77 S.Ct. 538], the Court analogized " 'records required by law to be kept in order that

there may be suitable information of transactions which are the appropriate subjects of governmental regulation and the enforcement of restrictions validly established' " to *public documents* in public offices. (*Shapiro, supra,* 335 U.S. at p. 17 [92 L.Ed. at p. 1799] italics and internal quotation marks omitted.) Since the holder of such required records could be considered merely a custodian for the state (*ibid.*), the high court reasoned that the administrative regulations which required the individual to retain his "customarily kept" business records imbued such records with "public aspects." (*Id.* at p. 34 [92 L.Ed. at p. 1808].) In dissent, however, Justice Frankfurter found "the notion that whenever [government] requires an individual to keep in a particular form his own books dealing with his own affairs his records cease to be his when he is accused of crime . . . startling." (*Id.* at p. 54 [92 L.Ed. at p. 1818] [dis. opn. of Frankfurter, J.].) I share his wonderment. This circular reasoning—that a governmental recordkeeping requirement could cause private records to become public records over which the recordkeeper lost control—was not lost on the other three dissenting justices. (See *id.* at pp. 70-71 [92 L.Ed. at p. 1827] [dis. opn. of Jackson and Murphy, JJ.], pp. 75-76 [92 L.Ed. at p. 1829] [dis. opn. of Rutledge, J.].)

As the dissenting justices noted, such logic could lead to recordkeeping requirements so broad as to consume entirely the guaranty against self-incrimination found in the Fifth Amendment. (*Shapiro, supra,* 335 U.S. at pp. 54, 70-71, 75-76 [92 L.Ed. at pp. 1818, 1826, 1829].) "Fortunately, [however,] although record keeping requirements are common . . . neither [the federal nor state governments] have seemed inclined to push the [required-records] doctrine to the limits of its logic." (McKay, *Self-Incrimination and the New Privacy,* 1967 Sup.Ct.Rev. 193, 215 [hereafter McKay].)

While *Shapiro* has been criticized for its questionable logic (see, e.g., Saltzburg, *supra,* 53 U.Chi.L.Rev. 6; McKay, *supra,* 1967 Sup.Ct.Rev. 193; Mansfield, *The Albertson Case: Conflict Between the Privilege Against Self-Incrimination and the Government's Need for Information,* 1966 Sup.Ct.Rev. 103 [hereafter Mansfield]; Note, *Constitutional Limits on the Admissibility in the Federal Courts of Evidence Obtained from Required Records* (1954) 68 Harv.L.Rev. 340), the high court's lapse of reason has been explained as perhaps due to the majority's perception of the need for strong governmental regulatory authority during wartime. (*Shapiro, supra,* 335 U.S. at pp. 8-15 [92 L.Ed. at pp. 1793-1797]; see Saltzburg, *supra,* 53 U.Chi.L.Rev. at p. 15; Mansfield, *supra,* 1966 Sup.Ct.Rev. at p. 149.) Chief Justice Vinson for the majority in *Shapiro* noted that the compelling interest in the national safety, as promoted by the Emergency Price Control Act, outweighed whatever denigration of the Fifth Amendment the required-records exception caused because "there is a sufficient relation between the activity sought to be regulated and the public concern so that the Government . . . can constitutionally require the keeping of particular records,

subject to inspection by the Administrator." (*Shapiro, supra,* 335 U.S. at p. 32 [92 L.Ed. at pp. 1806-1807].)

I find the notion of balancing the governmental interest in obtaining compelled self-incriminating evidence against a claim for Fifth Amendment protection to be highly questionable. I have always thought the privilege to be absolute. Indeed, even in cases of the most compelling nature, the trial of an accused serial killer for example, it has never occurred to this court or the United States Supreme Court to allow the state to use evidence obtained in violation of the Fifth Amendment because the need is compelling.

Citing *California* v. *Byers* (1971) 402 U.S. 424 [29 L.Ed.2d 9, 91 S.Ct. 1535], however, the majority appear to endorse such a balancing approach. (See maj. opn., *ante,* at pp. 488-489.) Accordingly, the majority holds, we should " 'balanc[e] the public need' for disclosure against 'the individual claim to constitutional protections.' " (*Ante,* at p. 488, citation omitted.) In *Byers,* the existence of an individual claim to constitutional protection was determined by evaluating the likelihood of criminal prosecution based on the compelled self-incriminating disclosure. (*Byers, supra,* 402 U.S. at p. 428 [29 L.Ed.2d at p. 17].) The "mere possibility of incrimination" does not sufficiently outweigh the policies in favor of statutorily compelled disclosure; rather, to invoke the privilege one must "show that the compelled disclosures will themselves confront the claimant with 'substantial hazards of self-incrimination.' " (*Id.* at pp. 428-429 [29 L.Ed.2d at p. 18], citing *Albertson* v. *SACB* (1965) 382 U.S. 70 [15 L.Ed.2d 165, 86 S.Ct. 194]; *Marchetti* v. *United States* (1968) 390 U.S. 39 [19 L.Ed.2d 889, 88 S.Ct. 697]; *Grosso* v. *United States* (1968) 390 U.S. 62 [19 L.Ed.2d 906, 88 S.Ct. 709]; *Haynes* v. *United States* (1968) 390 U.S. 85 [19 L.Ed.2d 923, 88 S.Ct. 722].) According to *Byers,* in order to determine if such a substantial hazard of self-incrimination exists, the court must determine if disclosures were sought from a " 'highly selective group inherently suspect of criminal activities [involving] an area permeated with criminal statutes [instead of] an essentially noncriminal and regulatory area of inquiry.' " (402 U.S. at p. 430 [29 L.Ed.2d at p. 18], citations omitted.) The majority in this case adopt this analysis and conclude, as in *Byers,* that employers such as defendant are not presented with a hazard of self-incrimination substantial enough to outweigh the state's interest in compelling disclosure of the records.

The fact that Chief Justice Burger was able to persuade only three other justices of the soundness of this approach is perhaps indicative of its weakness. As Justice Black pointed out in dissent, while the reporting statute in *Byers* posed no substantial hazard of self-incrimination in the abstract, such an approach ignored that the particular defendant in that case clearly would "have run a serious risk of self-incrimination by complying with the disclosure statute." (402 U.S. at p. 461 [29 L.Ed.2d at p. 36]

[dis. opn. by Black, J.].) That is the case here. It cannot seriously be argued that "no substantial hazard of self-incrimination" is posed by compelling defendant to produce the wage and hour records which document transactions specifically suspected by the Division as being "in violation of certain sections of the Labor Code [concerning] payment of wages for hours worked" and intended to be used to determine whether the asserted violations occurred. That the Division assures us it rarely pursues criminal remedies is no answer: the statute makes any of several violations criminal and the courts have no control over which cases the Division may choose for criminal prosecution.

Even if such balancing were deemed appropriate in cases where records are required to be kept, in this case the balance would clearly point toward precluding use of the records in a criminal prosecution. As noted earlier, the Division represented in oral argument that criminal prosecution was rarely, if ever, pursued for violation of the provisions governing overtime pay and employer-kept wage and hour records. It may therefore be presumed that the Division is able to accomplish its regulatory functions without resorting to criminal prosecution. Thus the state has limited, if any, interest in preserving the use of the records as evidence in a criminal action and defendant's Fifth Amendment claim should clearly prevail unless use immunity is given.

In the context of Fourth Amendment claims where a regulatory purpose is asserted as justification for a search, we insist that the targets of such a search be selected on the basis of neutral criteria in order to assure that the purpose is indeed regulatory and not based on an individualized suspicion of criminal conduct. (See *Ingersoll* v. *Palmer* (1987) 43 Cal.3d 1321 [241 Cal.Rptr. 42, 743 P.2d 1299].) Such an approach would also have value in determining the merits of Fifth Amendment claims regarding required records. For instance, if the Division in carrying out its regulatory function were to subpena records from every fiftieth or one-hundredth employer withholding state income taxes, I would have no objection to the use in criminal prosecution of records so obtained. Indeed, the *Byers* analysis would make sense in such a situation because, instead of focusing on an individual suspected of having violated the law and thus obviously posing to that individual a substantial hazard of self-incrimination, the agency would merely be evaluating compliance with wage and hour laws of a randomly selected group not inherently suspect of engaging in criminal activity. We adopted such an approach in the context of sobriety checkpoints to assure that police stops were conducted for essentially regulatory, as opposed to criminal investigation, purposes. (*Ibid.*) Although our concern in *Ingersoll* was assuring compliance with Fourth Amendment search and seizure constraints, such an approach would also help assure that the purpose of the compelled disclosure of wage and hour records is regulatory and not to

gather evidence for a criminal prosecutor. Where the purpose in obtaining such records is thus demonstrated to be truly regulatory in nature, it can truly be said the risk of self-incrimination is minimal. However, as noted, in this case we are presented with as pointed individualized suspicion of criminal activity as can be imagined, without any objective evidence of regulatory purpose.

In sum, if *Shapiro*'s required-records doctrine mandates that we weigh the state's interest in compelling self-incriminating disclosures against the Fifth Amendment guaranty against such self-incrimination, then absent an affirmative showing by the regulatory agency that criminal prosecution is essential to enforce a valid regulatory scheme, the agency's obtaining such records by compulsion must be conditioned on their unavailability for use in a criminal prosecution. In the absence of an applicable immunity provision, to avoid violation of the Constitution and to preserve the ability of the Division to perform its regulatory function, we should provide such immunity judicially. (See *Adams* v. *Maryland* (1954) 347 U.S. 179, 181 [98 L.Ed. 608, 612, 74 S.Ct. 442].)