Filed 7/28/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE ex rel. ROB BONTA, as Attorney General,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>GREENPOWER MOTOR COMPANY, INC. et al.,<br><br>    Defendants and Appellants. | A171390<br><br>(City & County of San Francisco Super. Ct. No. CPF-24-518469) |

GreenPower Motor Company Inc. (GreenPower) and San Joaquin Valley Equipment Leasing, Inc. (San Joaquin Leasing) appeal an order granting a petition filed by the People ex rel. Rob Bonta, as Attorney General (the Attorney General) seeking to compel appellants' compliance with administrative subpoenas issued under Government Code[1] section 11181. Appellants contend the petition should not have been granted because the court lacked jurisdiction under the doctrine of exclusive concurrent jurisdiction, and alternatively, that the subpoenas fail to meet constitutional standards for enforcement

---

[1] All undesignated statutory references are to the Government Code.

because they seek irrelevant records and are excessive for the purposes of their inquiry.  We find no error and affirm the order.

**BACKGROUND**

Launched by the California Air Resources Board ("CARB") in 2009, the California Hybrid and Zero-Emissions Truck and Bus Voucher Incentive Project ("HVIP") accelerates the adoption of electric vehicles (EVs) in California by subsidizing a portion of the price of qualifying vehicles.  According to the Attorney General, the program works as follows:  "At the time of sale, the price paid by the purchaser is reduced by the amount of the subsidy.  Thereafter, the dealer sends a voucher to CARB, which pays the subsidy to the dealer.  A single HVIP voucher can reimburse up to $100,000 per qualifying electric vehicle.  To obtain an HVIP voucher, the dealer and end user (i.e., purchaser or lessee) must submit:  (1) a form to CARB certifying under penalty of perjury that the electric vehicle was delivered; (2) a photo of the electric vehicle's odometer; and (3) the Vehicle Identification Number ("VIN").  Among other requirements, an electric vehicle end user must also operate the electric vehicle within the State of California for a minimum of three years."

GreenPower manufactures electric vehicles for commercial purposes.  San Joaquin Leasing is a wholly-owned subsidiary of GreenPower and leases GreenPower vehicles to third parties.  GreenPower was a participant in the HVIP program until March 9, 2023, when its ability to obtain vouchers was suspended following an investigation by CARB into GreenPower's compliance with HVIP requirements.  In September 2023,

GreenPower and San Joaquin Leasing filed a petition for writ of mandate in Sacramento County Superior Court seeking to compel CARB to "issue vouchers for electric vehicles . . . produced and distributed by GreenPower in full compliance with all applicable terms and conditions of the HVIP."

Around the same time, in August 2023, the corporate fraud section of Attorney General's Office commenced an investigation into violations of the HVIP. In September 2023, as part of this investigation, the Attorney General issued investigative subpoenas to GreenPower and San Joaquin Leasing. The subpoenas requested documents relating to appellants' "compliance with various aspects of the HVIP project from April 1, 2016 onward, including without limitation contracts and correspondence with customers and others relating to EVs for which HVIP vouchers were requested or redeemed and documents relating to the changing of VINs on EVs for which HVIP vouchers may have been obtained." The subpoenas set the deadline for production on or before October 27, 2023.

In February 2024, after several informal attempts at enforcing compliance failed, the Attorney General filed the present petition.

In March 2024, appellants filed a demurrer arguing that the court lacked "jurisdiction to hear the Petition due to the doctrine of exclusive concurrent jurisdiction, based on the earlier-filed Petition for Writ of Mandate filed by Respondents in the Superior Court for the County of Sacramento, which assumed jurisdiction to the exclusion of all others."

3

In April 2024, the trial court issued an order requiring appellants to show cause as to why they failed to comply with the subpoenas.

On May 17, the hearing on the demurrer was taken off calendar because the parties failed to meet and confer as required by Code of Civil Procedure section 430.41. However, the court minutes indicate that the issues raised in the demurrer could be addressed at the hearing on the order to show cause set for May 22.

On May 22, after receiving briefing from the parties, the matter was heard and taken under submission.[2] Thereafter, on July 31, 2024, the court issued an order requiring GreenPower and San Joaquin Leasing to produce documents responsive to the subpoenas.

## DISCUSSION

Section 11180 authorizes the Attorney General to investigate matters related to the business activities and subjects under its jurisdiction. Section 11181, subdivision (e) authorizes the Attorney General to issue an administrative subpoena in furtherance of such an investigation and section 11187 authorizes the Attorney General to petition the superior court for an order compelling compliance with the subpoena. Under section 11188, upon the filing of the petition, the court "shall enter an order" to show cause and then, "[i]f it appears to the court that the

---

[2] Because appellants opted to proceed on appeal without a record of the oral proceedings, the record on appeal does not include a transcript of the May 22 hearing.

4

subpoena was regularly issued, . . . the court shall enter an order" requiring compliance with the subpoena.

A trial court's order requiring compliance with a subpoena is appealable as a final judgment in a special proceeding. (Code Civ. Proc., § 904.1, subd. (a)(1); *People ex rel. DuFauchard v. U.S. Financial Management, Inc.* (2009) 169 Cal.App.4th 1502, 1511; *State ex rel. Dept. of Pesticide Regulation v. Pet Food Express* (2008) 165 Cal.App.4th 841.) "We review de novo the question whether the subpoena meets the standards for enforcement." (*Pet Food Express,* at p. 854.)

## I.    Exclusive Concurrent Jurisdiction

Before addressing the merits of the arguments regarding the validity of the subpoena, we address appellants' argument that the court lacked jurisdiction to enforce the subpoenas under the doctrine of exclusive concurrent jurisdiction.[3]

Under the doctrine of exclusive concurrent jurisdiction, "when two or more courts have subject matter jurisdiction over a dispute, the court that first asserts jurisdiction assumes it to the exclusion of the others. [Citation.] The rule is based upon the public policies of avoiding conflicts that might arise between courts if they were free to make contradictory decisions or awards relating to the same controversy and preventing vexatious litigation and multiplicity of suits. [Citation.] . . . [¶] . . . ' "[T]he rule of exclusive concurrent jurisdiction does not require absolute

_____

[3] In light of our determination below that the doctrine is not applicable to the present special proceedings, we need not address appellants' additional procedural arguments regarding the court's ruling on its demurrer.

5

identity of parties, causes of action or remedies sought in the initial and subsequent actions. [Citations.] If the court exercising original jurisdiction has the power to bring before it all the necessary parties, the fact that the parties in the second action are not identical does not preclude application of the rule. Moreover, the remedies sought in the separate actions need not be precisely the same so long as the court exercising original jurisdiction has the power to litigate all the issues and grant all the relief to which any of the parties might be entitled under the pleadings." ' " (*Shaw v. Superior Court of Contra Costa Cnty.* (2022) 78 Cal.App.5th 245, 255–256.) "The rule is 'a judicial rule of priority or preference and is not jurisdictional in the traditional sense of the word,' in that it 'does not divest a court, which otherwise has jurisdiction of an action, of jurisdiction.' [Citation.] Because it is a policy rule, application of the rule depends upon the balancing of countervailing policies." (*Id.* at p. 256.)

Although the Sacramento action and the present proceeding both generally involve the same subject matter— HVIP program requirements—the specific issue raised in the present proceeding is factually and legally distinct from the issues involved in the Sacramento action. In the Sacramento action, GreenPower and San Joaquin Leasing seek to compel CARB under Code of Civil Procedure section 1085 to "issue vouchers for electric vehicles . . . produced and distributed by GreenPower in full compliance with all applicable terms and conditions of the HVIP." They argue that CARB has a

6

ministerial duty to issue vouchers for eligible EVs and that CARB acted arbitrarily in suspending GreenPower from the program.  By contrast, the present proceeding is a limited special proceeding to enforce administrative subpoenas under section 11188.  (*People ex rel. Franchise Tax Bd. v. Superior Court* (1985) 164 Cal.App.3d 526, 539, disapproved on other grounds in *Dana Point Safe Harbor Collective v. Superior Court* (2010) 51 Cal.4th 1 [jurisdiction of the superior court in a hearing under section 11188 is limited to determining whether the subpoena conforms to legal and constitutional standards]; see also § 11187, subd. (d) [validity of objections to the Attorney General's subpoenas "shall be determined exclusively in a proceeding brought by the head of the department to compel compliance as provided in this section"].)  Insofar as the sole issue presented in this proceeding is the validity of the subpoenas, an issue not subject to determination in the Sacramento action, there is no risk of contradictory rulings and the doctrine of exclusive concurrent jurisdiction is not applicable.[4]

---

[4] At oral argument, the Attorney General contended that section 11187, subdivision (d), *required* that the petition be filed in San Francisco rather than in Sacramento.  Section 11187, subdivision (a), authorizes the head of the department conducting an investigation to file a petition to enforce compliance with a subpoena in "the superior court in the county in which the hearing or investigation is pending or the county in which testimony is designated in the subpoena to be given or documents or other items are designated in the subpoena to be produced." (See *Whitney v. Montegut* (2014) 222 Cal.App.4th 906, 913 [Los Angeles County Superior Court had jurisdiction to decide petition to compel compliance with an investigational subpoena

## II. Validity of Subpoenas

The Attorney General's power to make an administrative inquiry is akin "to the power of a grand jury, which does not depend on a case or controversy in order to get evidence but can investigate 'merely on suspicion that the law is being violated, or even just because it wants assurance that it is not.'" (*Brovelli v. Superior Court* (1961) 56 Cal.2d 524, 529 (*Brovelli*).) The parties agree that "the subpoenas are valid if: (1) they inquire into matters the agency is authorized to investigate; (2) they are 'not too indefinite'; and (3) the information sought is 'reasonably relevant' to the investigation." (*State Water Resources Control Bd. v. Baldwin & Sons, Inc.*, (2020) 45 Cal.App.5th 40, 55, citing *Brovelli, supra,* 56 Cal.2d 524; *Craib v. Bulmash* (1989) 49 Cal.3d 475, 478 ["[f]orty years of United States Supreme Court decisions establish that the subpoenaed records need only be relevant to an authorized regulatory purpose and described with reasonable specificity"].)

An investigative subpoena is sufficiently definite if it "clearly and specifically [identifies] the categories of documents

---

where "the record contains substantial evidence to support the trial court's finding that 'the investigation has been conducted in both Orange County and Los Angeles County'"].) Here, the subpoenas required that documents be delivered to the Attorney General's office in San Francisco, and the Attorney General represented at oral argument that the investigation is being conducted in San Francisco. It is unnecessary for us to reach this argument in light of our conclusion that the doctrine of exclusive concurrent jurisdiction does not apply, and in any event, the Attorney General did not raise the argument in the trial court or even on appeal until oral argument.

8

subject to production and has limited its requests in both scope and time." (*State Water Resources Control Bd. v. Baldwin & Sons, Inc.*, *supra*, 45 Cal.App.5th at p. 57; *Craib v. Bulmash, supra,* 49 Cal.3d 475, 482 [documents to be produced must be *"adequate, but not excessive,* for the purposes of the relevant inquiry"]; *California Restaurant Assn. v. Henning* (1985) 173 Cal.App.3d 1069, 1075 [" 'It is now settled that, when an administrative agency subpoenas corporate books or records, the Fourth Amendment requires that the subpoena be sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome' "].) The "reasonably relevant" standard for investigative subpoenas is afforded an "expansive definition" and is broader than the standards set forth against a party seeking discovery pending litigation. (*State Water Resources Control Bd.*, *supra*, at p. 57.) The hearing on the order to show cause pursuant to section 11188, however, is not "a hearing in the nature of a motion to quash." (*Fielder v. Berkeley Properties Co.* (1972) 23 Cal.App.3d 30, 40 (*Fielder*).) The party challenging the subpoena is not entitled to "dispute and contradict the factual matters contained in the declarations supportive of the subpoenas." (*Ibid*.)

### A. The Investigation

On appeal, the Attorney General characterizes the investigation as commencing in 2023 after the office received credible information that millions of dollars of taxpayer funds were distributed to certain HVIP participants by means of fraud

9

in violation of the California False Claims Act (Gov. Code § 12650 et seq.) (False Claims Act).[5] The Attorney General distinguishes his investigation from that being conducted by CARB, which "also involves potential fraud on the HVIP program," but concerns GreenPower's "compliance with CARB's HVIP program and its implementation manual," rather than violations of the False Claims Act.

Initially, appellants fault the Attorney General for failing to disclose the basis of the investigation—potential violations of the False Claims Act—in the trial court. They argue that this court "should rightly be concerned with how coy, deceptive, and evasive the State has been in its investigation of Appellants" and

_____

[5] In the trial court, appellants objected to the statement in the declaration submitted by the Attorney General that its investigation was based on "credible information" regarding apparent violations of the HVIP on the ground that the declarant, a deputy Attorney General, lacked personal knowledge of the "credible information" so that her statement was based on inadmissible hearsay. In appellants' opening brief, they reference this objection only briefly as follows: "Further, the sole evidence supporting the State's assertion that it has a separate investigation is the hearsay declaration of an attorney who had no personal knowledge of, and rendered improper opinions regarding, statements made by another attorney who actually participated directly in the CARB investigation. Appellants properly objected to this inadmissible evidence." We do not understand this argument as asserting any challenge to any evidentiary ruling implied by the trial court's order, nor would it be sufficient to do so. (*Rojas v. Platinum Auto Group, Inc.* (2013) 212 Cal.App.4th 997, 1000, fn. 3 [conclusory statements do not satisfy appellant's burden on appeal to provide sufficient legal argument, supported by citation to legal authorities, demonstrating that the trial court erred].)

that we "should decline to consider the State's new arguments, which raise issues of fact that Appellants did not have the opportunity to litigate below." Appellants also argue that there is only one investigation and that "any suggestion that CARB and [the Attorney General] have been acting independently in their mutual, coordinated investigation is mere pretense."[6]

Notwithstanding the emphasis placed on this issue by appellants, whether the Attorney General contemplated that the False Claims Act would serve as the basis for liability for violations of the HVIP requirements under investigation is not determinative of the issue before us. There is no dispute that the Attorney General has authority to investigate compliance both with the False Claims Act and with HVIP. Nor is any potential overlap between the CARB investigation and the Attorney General's investigation particularly material to the question before us. Appellants have cited no authority suggesting that the existence of a similar or related investigation being conducted by CARB, or the Attorney General's possible involvement in that investigation, renders the subpoenas at issue invalid.

Moreover, the Attorney General's failure to refer to the False Claims Act did not mean the trial court lacked an adequate basis to evaluate whether the requests were "reasonably relevant" to the investigation. (*State Water Resources Control*

---

[6] Although the Attorney General did not mention the False Claims Act in the trial court, the deputy Attorney General did tell appellants' counsel by email that the subpoenas "are separate and apart from whatever investigation CARB [] may be conducting."

11

*Bd. v. Baldwin & Sons, Inc.*, *supra*, 45 Cal.App.5th at p. 55.)  The petition explained that the investigation into "potential violations of HVIP" began after the Attorney General "received credible information showing that certain participants in HVIP obtained vouchers . . . based on false representations that EVs had been delivered to and were being used by an end user when in fact they were never delivered or operated.  The information . . . also suggests that certain participants in HVIP may have made false representations and changed Vehicle Identification Numbers (VINs) to impermissibly 'double-dip' by obtaining more than one HVIP voucher for a single EV, and may have committed additional acts in violation of HVIP's governing regulations and other statutes."  The memorandum in support of the motion for an order to show cause added that "[t]he Attorney General is investigating whether Greenpower and [San Joaquin Leasing] improperly obtained vouchers under HVIP so as to unlawfully receive millions of dollars of California taxpayers' money in connection with the sale of certain electric vehicles," and the reply to the OSC response argued that the requests "are reasonably relevant to the People's investigation of whether there was an exploitation of the HVIP program by means of fraud."  Even without a reference to the False Claims Act, these statements sufficiently described the nature and scope of the investigation to enable the court to evaluate the relevance of the requests.

### B.    The GreenPower Subpoena

The subpoena seeks:  (1) all documents relating to HVIP submitted to or received from CARB, Calstart, Inc. or Tetra Tech, Inc.;[7] (2) all communications, including those internal to GreenPower and those between GreenPower and certain identified customers, relating to HVIP or any electric vehicle for which a HVIP voucher was requested or redeemed; (3) all documents relating to GreenPower's lease of EVs for which HVIP vouchers were received; (4) all contracts and agreements between Green Power and certain identified customers; (5) all documents relating to the sale or re-sale of any EV for which an HVIP voucher was requested or redeemed; (6) all documents relating to the lease of any EV for which an HVIP voucher was requested or redeemed; (7) all documents relating to the termination of any lease for any EV for which an HVIP voucher was redeemed; (8) all documents relating to the physical delivery of any EV sold or leased to identified customers for which an HVIP voucher was redeemed; (9) all documents relating to any payment made or received by GreenPower relating to any EV for which an HVIP voucher was redeemed; (10) all documents relating to the finish manufacturing of any EV for which an HVIP voucher was requested or redeemed; (11) all documents relating to the storage of any EV for which an HVIP voucher was redeemed; (12) all documents relating to the repossession of any EV for which an HVIP voucher was redeemed; (13) all documents relating to the

---

[7] According to the parties, Calstart, Inc. and Tetra Tech, Inc. are entities that process HVIP vouchers for the State.

13

VIN of any EV sold or leased to identified customers; (14) all documents relating to the designating, affixing, stamping, riveting, labeling, changing, altering, removing, concealing or obscuring the VIN for any EV; (15) all communications by or between GreenPower and any Federal, State or local government agency relating to the modification, concealment, obscuration or replacement of any vehicle's VIN; (17) all communications by or between GreenPower and any person or entity relating any vehicle's VIN; (18) all documents relating to the modification, concealment, obscuration or replacement of any vehicle's VIN; and (20) GreenPower's corporate documents.[8]  The subpoena identified the relevant period as April 1, 2016 through the final response date of the subpoena.

The Attorney General argues that request numbers 1, 2, 3, 5, 6, 7, 9, 10, 11, and 12 directly relate to GreenPower's "participation in HVIP by requesting communication and/or documents relating to 'electric vehicles for which an HVIP voucher was requested or redeemed' to better identify the bases under which each respondent obtained an HVIP voucher and whether each HVIP voucher was obtained in compliance with the HVIP requirements."  Similarly, the Attorney General argues that request numbers 14, 15, 16, 17, 18, and 19 "directly relate to any conduct that may put at question the veracity of the VINs submitted by [GreenPower]; specifically, helping to further

_____

[8] Request numbers 16 and 19 are duplicative of other requests and have been eliminated from the above list.  We maintain the original numbering for ease of responding to the parties' arguments.

14

investigate whether there were multiple VINs used on the same qualifying electric vehicle, which would frustrate HVIP's purpose." Next, the Attorney General argues that request numbers 4, 8, and 13 "directly relate to the agreements entered into by and between Respondents and thirteen known lessees and/or purchasers of HVIP-qualifying electric vehicles to better identify whether each HVIP-qualifying electric vehicle was physically delivered and whether each HVIP-qualifying electric vehicle was operated, and stayed in operation, in the State of California for at least three years as required." Finally, the Attorney General argues that request number 20 "directly relates to the People's investigation by further identifying the interconnected network of HVIP participants who may have information about the fraudulent scheme involving the HVIP program."

Other than requests number 4 and 20, each of the requests include language limiting responsive documents to those directly relating to the HVIP program or to VINs of EVs sold or leased by GreenPower and, as such, they are relevant to an authorized regulatory investigation and described with reasonable specificity. While it is possible that request number 4, which seeks all contracts and agreements between GreenPower and certain identified customers, might be understood as requesting documents that exceed the scope of the Attorney General's investigation, GreenPower fails to address this, or any request, individually.

15

Rather, GreenPower argues generally that the subpoena is "excessive and unlimited in scope" so that, short of producing every document in its possession, "compliance is actually impossible." It argues further that "the time frame of the subpoena[] is arbitrary and capricious" because the subpoena seeks documents going back to April 1, 2016, which "bears no relationship to the dispute or the investigation" and which "conflicts with the HVIP regulations, which only require maintenance of records for three years, and a commitment to operate the subject EVs for three years after voucher redemption."

The Attorney General disagrees that the subpoenas "seek to obtain 'every single document, record, communication between Appellants and everyone relating in any way to the HVIP program and EV leasing' " and responds that "the fact that a subpoena requires the production of many relevant documents in no way means the subpoena is deficient." In response to questioning by the court at oral argument, counsel for the Attorney General disputed appellants' suggestion that the April 2016 date was randomly or arbitrarily selected. While declining to provide specific details that he suggested could compromise confidential aspects of the investigation, he represented that the date was selected based on relevant factual information available to investigators, including the timing of GreenPower's application to participate in the program. In the trial court the Attorney General also argued that, while GreenPower argues broadly that all of the People's requests are

16

excessive and burdensome, it has offered "no limiting counterproposal" and "failed to meaningfully meet and confer with the People to try to resolve these purported 'scope' issues."

In *In re Subpoena Duces Tecum* (4th Cir. 2000) 228 F.3d 341, 350, the court held that as a "condition to maintaining the argument that an investigative subpoena is overly broad and oppressive," the party opposing the subpoena must "be able to point to reasonable efforts on his behalf to reach accommodation" with the party issuing the subpoena. (Accord, *United States v. Morton Salt Co.* (1950) 338 U.S. 632, 653 ["Before the courts will hold an order seeking information reports to be arbitrarily excessive, they may expect the supplicant to have made reasonable efforts . . . to obtain reasonable conditions"]; *Doe v. United States* (6th Cir. 2001) 253 F.3d 256, 268–269 [declining to find administrative subpoena "overly burdensome" where objector "made no attempt to reach a reasonable accommodation with the government regarding this aspect of the subpoena" and has only offered "a general and conclusory statement as to why this request constitutes an undue burden"].)

Here, the Attorney General explained that the investigators "proposed a set of streamlined search strings that would aid in narrowing Respondents' document production. Respondents did not respond. On October 17, 2023, in advance of the October 27, 2023 response deadline, the People requested a meet and confer to reach an agreement as to the search strings to be used. Respondents neither responded nor revised, countered, or otherwise modified the proposed search strings. If the

proposed search strings returned too many documents, Respondents should have—as the People repeatedly requested—engaged in a good faith meet and confer so that the parties could jointly identify an applicable set of search strings. Respondents did not."

In an email sent to the Attorney General dated October 31, 2023, which was attached to a declaration submitted by the Attorney General, appellants' counsel wrote, "[W]e need to discuss the scope of the requests and the search terms. My client has indicated that . . . searching for the first term in your search requests resulted in 23,921 emails, and this individual is not very involved in the HVIP program. Initial impressions lead us to believe that a comprehensive search of everyone's electronic records would return an incredible number of emails and other documents. . . . My hope is that we can find a way to target those documents you are most interested in and work from there. [¶] I will circle back with my folks and get back to you shortly with proposed dates and times for a conference."

On November 7, a deputy Attorney General had a conference call with appellants' counsel in which they discussed "production logistics" and discussed the need for an additional conference involving their respective "IT people." Thereafter, however, despite attempts by the Attorney General to resolve this matter informally, counsel for appellants failed to respond for three months, leading to the filing of the petition to compel.

On this record, we cannot conclude that the subpoena as a whole, which seeks production of definite and relevant, if perhaps

18

voluminous, documents is excessive or overly burdensome. While the approximately seven-year period selected by the Attorney General, as compared to the three-year period suggested by appellants on appeal, undoubtedly enlarged the number of responsive documents, GreenPower has not argued that any documents are unavailable. (See *Fielder, supra,* 23 Cal.App.3d at p. 42 [subpoenas required the production of "[o]nly such records as were in the custody and control of appellants"].) Nor has it made a meaningful attempt to limit the scope of the request through negotiations with the Attorney General.[9] GreenPower's conclusory assertion that the subpoena is oppressive is also not supported by necessary analysis. (See *Oklahoma Press Publishing Co. v. Walling* (1946) 327 U.S. 186, 209 ["excess in the breadth of the subpoena" is a "matter[] variable in relation to the nature, purposes and scope of the inquiry"]; see also *Galland v. City of Clovis* (2001) 24 Cal.4th 1003, 1037 [in determining whether an administrative subpoena's "request for information is excessive, courts perform a balancing test, considering factors including: (1) the scope of the investigation; (2) the probability that the records will reveal evidence helpful to the investigation;

---

[9] At oral argument, appellants' counsel acknowledged a "failure in the meet and confer process" but argued that his clients were justified in their refusal to negotiate because they believed that the subpoenas were part of or related to the alleged "arbitrary and capricious" investigation being conducted by CARB that they were challenging in the Sacramento County Superior Court action. We disagree that appellants' "concerns" regarding the "timing" of the issuance of the subpoenas justified their refusal to meet and confer regarding the allegedly excessive and burdensome scope of the document requests.

19

(3) the financial or economic burden that compliance imposes on the subpoenaed party"].)

Accordingly, we conclude that trial court did not err in granting the petition and ordering GreenPower to comply with the subpoena.

### C.     The San Joaquin Leasing Subpoena

The subpoena issued to San Joaquin Leasing is nearly identical to that issued to GreenPower and merely substitutes San Joaquin Leasing in place of GreenPower for each request. San Joaquin Leasing argues that the subpoena directed to it was invalid because it was never a participant in the HVIP program that formed the basis of the Attorney General's investigation.

The Attorney General explains the relevance of San Joaquin Leasing to the investigation as follows:  The "investigation focuses on potential violators of the [False Claims Act].  [San Joaquin Leasing] is a leasing arm of GreenPower and works with GreenPower on transactions involving the HVIP program.  Thus, while [San Joaquin Leasing] was not a direct participant in the HVIP program, [it] is subject to the People's investigation as a potential [False Claims Act] violator, which would not require HVIP participation.  For example, [San Joaquin Leasing] would violate the [False Claims Act] by conspiring with GreenPower to submit false HVIP claims or making fraudulent statements that GreenPower used to get such claims paid. . . .  And that would be true regardless of whether it participated in the HVIP program or violated any law or regulation enforced by CARB."

20

San Joaquin Leasing characterizes the Attorney General's argument as relying on the "absurd leap" that San Joaquin could be "conspiring with GreenPower." San Joaquin Leasing argues that if a potential conspiracy is "the standard, then any corporation or individual anywhere would be subject to an investigative subpoena for anything. Any statutory or constitutional limits to the State's sweeping subpoena power would dissolve like salt in water." But San Joaquin Leasing is not "any corporation" with respect to GreenPower. It is a wholly-owned subsidiary, responsible for leasing GreenPower's EVs to third parties. As such, it is reasonably related to the Attorney General's investigation into GreenPower's compliance with the HVIP and potential violations of the False Claims Act. Accordingly, the trial court did not err in granting the petition and ordering San Joaquin Leasing to comply with the subpoena.

## DISPOSITION

The order granting the Attorney General's petition is affirmed.

GOLDMAN, J.

WE CONCUR:

BROWN, P. J.
CLAY, J. *

---

*Judge of the Alameda Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

21

| | |
|---|---|
| Trial Court: | City and County of San Francisco Superior Court |
| Trial Judge: | Honorable John-Paul S. Deol |
| Counsel for Defendants and Appellants: | Gordon Rees Scully Manukhani, Brian M. Ledger, Christopher T. Johnson |
| Counsel for Plaintiff and Respondent: | Rob Bonta<br>Attorney General of California<br>Martin H. Goyette<br>Senior Assistant Attorney General<br>Frederick W. Acker<br>Supervising Deputy Attorney General<br>Diane J. Kim<br>Deputy Attorney General<br>David A. Eligator |